**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF NEW YORK**
----------------------------------------------------------X
DR. GERALD FINKEL,

                    Plaintiff,

        - against -

HALL-MARK ELECTRICAL
SUPPLIES CORP., et al.,

                  Defendants.
----------------------------------------------------------X

**REPORT AND
RECOMMENDATIONS**

07-CV-2376 (NGG) (JO)

**JAMES ORENSTEIN, Magistrate Judge:**

Dr. Gerald Finkel ("Finkel"), as an administrator and fiduciary of various benefit plans for workers in the electrical industry (the "Plans") asserts that defendant Hall-Mark Electrical Supplies Corp. ("Hall-Mark"), Zizza and Co. ("Zizza"), and Primary Capital Resources, Inc. ("Primary") are jointly and severally liable for Hall-Mark's alleged failure to make contributions to, and its constructive untimely withdrawal from, the Plans, in violation of Hall-Marks' obligations under both a collective bargaining agreement and the Employee Retirement Income Security Act, 29 U.S.C. § 1001 *et seq*. ("ERISA").  Docket Entry ("DE") 8 (Second Amended Complaint).  The defendants never responded to any of the complaints, and on January 9, 2009, Finkel moved for default judgment.  DE 12.  On March 30, 2009, the Honorable Nicholas G. Garaufis referred the motion to me for a report and recommendation.  DE 14.  I now make my report and, for the reasons set forth below, respectfully recommend as follows:  on the first four causes of action relating to unpaid contributions to the Plans, the court should conditionally enter judgment against Hall-Mark alone in the total amount of $62,996.01; on the fifth cause of action relating to withdrawal liability, the court should conditionally find all three defendants jointly and severally liable for a total amount of $358,862.05.

I.      Background

        Plaintiff Finkel is the Chairman of the Joint Industry Board of the Electrical Industry (the "Joint Board"), which administers several employee benefit plans established pursuant to collective bargaining agreements between Local No. 3 of the International Brotherhood of Electrical Workers, AFL-CIO ("Local 3"), and a variety of employers.  Second Amended Complaint ("Complaint") ¶ 4;[1] Declaration of [Joint Board associate counsel] Christina A. Sessa ("Sessa") in Support of Plaintiff's Motion for Default Judgment ("Sessa Dec.") ¶ 3.  Defendant Hall-Mark is an electrical contractor bound to the terms of a collective bargaining agreement in effect from May 1, 2005 through April 30, 2008.  Sessa Dec., Ex. A (the "CBA") at 1; *but see* Sessa Dec. ¶ 4 (stating that the start of the CBA's term was July 30, 2005).  The CBA required Hall-Mark to remit each week to the Joint Board contributions for each of the component Plans,[2] and also to submit weekly payroll reports calculating the total contributions due for that week as well as a breakdown of each covered employee's name, gross wages, and hours worked.  Complaint ¶¶ 7, 14-16; CBA at 11-23; Sessa Dec. ¶¶ 9-14.

---

[1] As discussed below, the Second Amended Complaint is the operative pleading on which Finkel now seeks judgment.  For ease of reference, I will cite is simply as the "Complaint" and make it clear when I am instead referring to its predecessors.

[2] The relevant Plans are the Employee Security Fund of the Electrical Products Industries Health and Welfare Plan (the "H&W Plan"), the Employee Security Fund of the Electrical Products Industries Pension Plan (the "Pension Plan"), the Annuity Fund of the Electrical Industry (the "Annuity Fund"), the Health Reimbursement Account Plan of the Electrical Industry (the "HRAP Plan"), the Educational and Cultural Trust Fund of the Electrical Industry (the "Educational Fund"), and the Deferred Salary Plan of the Electrical Industry (the "401(k) Plan").  In addition, the CBA requires Hall-Mark to deduct and pass along to Local 3 – not to the Plans or the Joint Board, as discussed below – the union dues for employees who are union members and who have authorized it to deduct such dues from their wages.  CBA at 11; *but see* Complaint ¶ 6 (alleging that the CBA required Hall-Mark to remit union dues "to the Joint Board").

Finkel asserts that, notwithstanding its contractual obligations, Hall-Mark ceased its

operations on April 20, 2007, and that it failed to make some of the required contributions at

around the same time. Complaint ¶¶ 19, 21[3]. Finkel goes on to contend that Hall-Mark's shut-

down effected a complete withdrawal from the Pension Plan, and thereby exposed Hall-Mark to

certain liability under 29 U.S.C. § 1383(a). Complaint ¶ 26; *see generally* 29 U.S.C. § 1381, *et*

*seq.* (the Multiemployer Pension Plan Amendment Act of 1980 ("MPPAA"), amending ERISA).

Pursuant to the relevant provisions of ERISA and the MPPAA, the Joint Board notified

Hall-Mark of the perceived withdrawal in a letter dated May 30, 2007, in which it also made a

demand that Hall-Mark pay withdrawal liability in the amount of $457,612, in 69 quarterly

instalments of $11,170.25, and one final payment of $4,146.19. Complaint ¶ 28; Sessa Dec. Ex.

G (the "Demand Letter"). The Joint Board subsequently revised its estimate of the withdrawal

liability to the reduced amount of $273,209, payable in 30 quarterly installments of $11,170.25

and one payment of $8.853.36. Complaint ¶ 28; Sessa Dec. Ex. H. In addition to requesting

payment, the Demand Letter also requested that Hall-Mark provide information regarding its

"controlled group"– that is, information about related entities that might also be liable under

ERISA and the MPPAA for Hall-Mark's liability. *See* Sessa Ex. G; 29 U.S.C. § 1301(a)(14),

(b)(1); 26 C.F.R. § 1.414(c)-2(c).

The Joint Board declared Hall-Mark to be in default of its obligations under the CBA at a

meeting on August 30, 2007. Complaint ¶ 33. Several weeks later, it wrote letters stating that,

---

[3] Specifically, Finkel complains that Hall-Mark did not make required contributions for any of
the Plans for the weeks ending March 14, 2007 through May 2, 2007, and that it also failed to
make the required contribution to the 401(k) Plan for the weeks ending April 11, 2007 and April
18, 2007. Complaint ¶ 21.

as a result of the default, the Joint Board had exercised its contractual right to accelerate payment of Hall-Mark's withdrawal liability and demanding prompt and full payment not only of the withdrawal liability amount, but also of interest and certain liquidated damages. Apparently due to the fact that Hall-Mark had ceased operations, these letters were sent to specific individuals the Joint Board believed to be responsible for the company's affairs: the first, dated September 26, 2007, was addressed to Charles Roslonowski, to whom the Demand Letter had likewise been addressed; the second, dated October 18, 2007, was addressed to Hall-Mark's sole shareholder, Salvatore J. Zizza.[4] Complaint ¶¶ 34-35; Sessa Dec. Exs. K-L. Hall-Mark never responded to any of the Joint Board's demands. Nor did it either request review of the assessment of withdrawal liability within 90 days or seek arbitration of the matter. As a result, Finkel alleges, it waived its right to contest such liability. Complaint ¶¶ 36-38; *see* 29 U.S.C. §§ 1399(b)(2)(A) and 1401(a)(1)(A) (both cited in Complaint ¶ 37).

Finkel initiated this lawsuit on June 13, 2007. In the original complaint, he sued only Hall-Mark and sought only damages for its unpaid contributions for the weeks ending March 14, 2007, through May 2, 2007; despite the fact that the Joint Board had already demanded that Hall-Mark make payment for its withdrawal liability, there was no mention of such a claim in that

---

[4] The Joint Board sent the letter of September 26, 2007, to Mr. Roslonowski at two different addresses in New York City: one in care of Metropolitan Paper Recycling ("Metropolitan") and the other in care of The Lehigh Group ("Lehigh"). Sessa Dec. Ex. K at 1. Neither Metropolitan nor Lehigh is a party to this case, and as far as I can discern from the record, neither bears any other relationship to the parties or the events at issue. Moreover, Finkel does not specify in any of his filings who Roslonowski is, or what position he may once have held in Hall-Mark. I infer from the repeated contacts between Roslonowski and the Joint Board that Roslonowski was likely an officer of defendant Hall-Mark. I note, however, that Finkel would not have to risk reliance on such an attenuated theory if he had simply adduced information in the record that is undoubtedly available to him. The Joint Board's letter to Mr. Zizza was addressed to him at Metropolitan. Sessa Dec. Ex. L at 1.

initial pleading.  DE 1.  Finkel properly served Hall-Mark via the New York Secretary of State on June 19, 2007.  DE 3.  The magistrate judge then assigned to the case scheduled an initial conference for October 2, 2007, DE 2; however, days before that scheduled conference, with Hall-Mark not yet having answered the initial complaint in the months since it had been filed, Finkel asked to delay the conference so that he could file either a motion for a default judgment or an amended complaint adding the claim for withdrawal liability he had previously omitted. DE 4.  The court promptly granted that request.  Order dated September 28, 2007.  Weeks later, on October 18, 2007 (the same date as the Joint Board's letter to Salvatore Zizza) Finkel filed a first amended complaint that again sued only Hall-Mark but added a claim for withdrawal liability.  DE 5.  Finkel served this amended complaint on Hall-Mark as well, via service on the Secretary of State on November 8, 2007.  DE 6.

The case then sat idle, at least in this court, for about eight months.  On July 15, 2008, Finkel's counsel informed the court that he had been in touch with an attorney representing Hall-Mark, and had learned that the company might not be able to satisfy any judgment against it because its assets had been seized by a creditor.  However, Hall-Mark's counsel also mentioned two entities that he described as being under common control with Hall-Mark, and as a result, Finkel's counsel requested leave to file yet another complaint that would add withdrawal liability claims against those entities pursuant to a provision of ERISA that imposes joint and several liability on any trade or business under common control with an employer that withdraws from a covered benefits plan.  *See* DE 7 at 2 (citing 29 U.S.C. § 1301(b)(1)).  The court granted the request the next day, and Finkel promptly filed the Second Amended Complaint, which is the pleading currently in effect.  DE 8.  Finkel served that pleading on each of the newly added

defendants, via the Secretary of State in each case, on July 22, 2008. DE 9; DE 10. However, although Finkel now asserts in a memorandum of law that the Second Amended Complaint "was served on Hall-Mark on July 18, 2008," DE 12-8 (plaintiff's memorandum of law) ("Memo.") at 5, neither the docket nor the evidence he cites supports that assertion. *See* DE 12-6 (Declaration of [Finkel's counsel] David R. Hock) ("Hock Dec.") ¶ 4 (omitting mention of service on Hall-Mark on July 18, 2000, and citing certificates of service included in DE 12-1); DE 12-1 (notice of motion, Ex. A, including certificates of service on defendants Zizza and Primary but not Hall-Mark). Thus, as far as the record shows, Finkel has never served Hall-Mark with the Second Amended Complaint.

After filing and serving the Second Amended Complaint, Finkel again let the case sit idle in this court for months, despite the fact that no defendant had ever responded to any of the claims. On January 8, 2009, I issued an order advising Finkel that unless there was an answer, a stipulation extending the time to answer, or a request to enter the defendants' default, I would deem the case abandoned and recommend its dismissal. DE 11. Thus prompted, Finkel moved simultaneously moved for both the entry of a default and the entry of a default judgment in his favor the next day. *See* DE 12. The Clerk noted the defaults of all three defendants on the same day, and the court referred the matter to me shortly thereafter. DE 13; DE 14. I then directed the plaintiff to submit to me and to the defendants,[5] no later than April 13, 2009, any additional evidence he wished to have me consider. Order dated March 23, 2009. Finkel submitted nothing additional except for a status report reviewing his previous filings. DE 17.

---

[5] As directed, Finkel attempted to serve a copy of my order on each named defendant (including Hall-Mark), but each mailing was returned as undeliverable. *See* DE 15; DE 16.

## II.    Discussion

### A.    Liability

#### 1.    The Effect Of A Defendant's Default

When a defendant defaults, the court must accept as true all well-pleaded allegations in the complaint, except those pertaining to the amount of damages.  Fed. R. Civ. P. 8(b)(6); *see Finkel v. Whiffen Electric Co.*, 2009 WL 2432723, at *2 n.6 (Aug. 11, 2009) (citing *Greyhound Exhibitgroup, Inc. v. E.L.U.L. Realty Corp.*, 973 F.2d 155, 158 (2d Cir. 1992).  The fact that a complaint stands unanswered does not, however, suffice to establish liability on its claims:  a default does not establish conclusory allegations, nor does it excuse any defects in the plaintiff's pleading.  *See Trans World Airlines, Inc. v. Hughes*, 449 F.2d 51, 69 (2d Cir. 1971) (complaint must be well-pleaded and allege "specific acts" not mere conclusory and vague allegations), *rev'd on other grounds*, 409 U.S. 363 (1973); *Century 21 Real Estate, LLC v. Raritan Bay Realty, Ltd.*, 2008 WL 4190955, *3 (E.D.N.Y. Sept. 3, 2008); *Directv, Inc. v. Neznak*, 371 F. Supp. 2d 130, 132-33 (D. Conn. 2005) (denying default judgment on several claims based only on conclusory allegations which lacked a sufficient factual basis for a finding of liability); *see also Greyhound Exhibitgroup*, 973 F.2d at 159 (complaint's assertion of proximate cause necessary for finding of liability must be "properly alleged"); *Levesque v. Kelly Communications, Inc.*, 1993 WL 22113, at *5 (S.D.N.Y. Jan. 25, 1993) ("the Court must be satisfied initially that the allegations of the complaint are 'well-pleaded'") (citing *Hughes*, 449 F.2d at 63).  Accordingly, before considering the issue of damages, I first examine whether the Complaint successfully states a claim for relief as to each of Finkel's claims against each defendant.

Of course, the law discussed above does not apply to a defendant who is not in default – and is appears that defendant Hall-Mark is not. As set forth above, there is no evidence in the record to suggest that Finkel ever served the Second Amended Complaint on Hall-Mark. To be sure, Hall-Mark has had adequate notice of the substance of the pending claims against it: Finkel did effectively serve both the original complaint and the first amended version of it on Hall-Mark, and the latter included all of the substantive claims against Hall-Mark that are re-pleaded in the Second Amended Complaint. Nevertheless, Finkel's failure to serve Hall-Mark (or at a minimum to prove that he has done so) is significant as a legal matter because the *only* claims now pending against that defendant are those pleaded in the Second Amended Complaint. *See Dluhos v. Floating and Abandoned Vessel, Known as New York*, 162 F.3d 63, 68 (2d. Cir. 1998) (quoting *Shields v. Citytrust Bancorp, Inc.*, 25 F.3d 1124, 1128 (2d Cir.1994)) ("[i]t is well established that an amended complaint ordinarily supercedes the original, and renders it of no legal effect."). As a result, Hall-Mark has not been properly notified of the pendency of the claims on which Finkel now seeks relief. I therefore conclude that there was no basis for the Clerk to enter Hall-Mark's default, and that the court has no choice but to deny Finkel's motion for a default judgment against that defendant.

Moreover, because Finkel has failed to serve the Second Amended Complaint on Hall-Mark within 120 days of filing the pleading on the docket, his claims against Hall-Mark are subject to dismissal. *See* Fed. R. Civ. P. 4(m). Such a result would apparently have little practical significance: it appears that Finkel seeks a judgment against Hall-Mark that he knows he will never collect. *See* DE 7 (noting that Hall-Mark ceased operations and that its assets have

been seized by a creditor).[6]  Nevertheless, under the circumstances I respectfully recommend that the court grant Finkel a final opportunity to properly serve it with the Complaint no later than the date by which objections to this Report and Recommendation must be filed.  If he does so, and if Hall-Mark then defaults (and if Finkel promptly acts on that default rather than again waiting for a reminder from this court), I recommend that the court then award Finkel a default judgment. To assist the court in that regard, I include in this Report and Recommendation my analysis of the Complaint's substantive claims against Hall-Mark as well as the damages award that will be available to Finkel in the event the court ultimately finds that he has satisfied the requirements for a default judgment against that defendant.

### 2.    Liability For Unpaid Contributions

ERISA is a comprehensive legislative scheme that governs the administration of employee benefit funds in the interest of protecting employees.  *See HMI Mech. Sys., Inc. v. McGowan*, 266 F.3d 142, 148 (2d Cir. 2001) (citing *Burgio and Campofelice, Inc. v. New York State Dep't of Labor*, 107 F.3d 1000, 1007-08 (2d Cir. 1997)).  It does not require employers to provide any particular benefits; rather, once an employer elects to provide benefits, ERISA regulates the terms of administration.  *See Burgio*, 107 F.3d at 1008.  Employers obligated to make contributions within the meaning of the statute must do so in accordance with the relevant multi-employer plan or collective bargaining agreement.  *See* 29 U.S.C. § 1145; *Cement and*

---

[6]  Indeed, it appears that the entire motion is an exercise in futility:  the fact that Finkel has been unable to reach any of the three defendants by mail suggests that all of them may well be judgment-proof.  I offer no opinion as to whether it is a wise use of the Plans' resources, and an appropriate exercise of the fiduciary's discretion, for Finkel to spend time and money in the pursuit of a worthless judgment; regardless of the answer to that question, he has seen fit to pursue the matter and it is therefore this court's duty to resolve the instant motion on the merits.

*Concrete Workers Dist. Council v. Lollo*, 35 F.3d 29, 36 (2d Cir. 1994) (duty to pay benefits must spring from a source other than ERISA) (citing *Mass. Laborers' Health & Welfare Fund v. Starrett Paving Corp.*, 845 F.2d 23, 25 (1st Cir. 1988)). The statute's overarching purpose – to protect fund beneficiaries' rights – is equitable, and the court therefore enjoys considerable discretion to fashion appropriate relief where a plaintiff successfully proves a violation. *Katsaros v. Cody*, 744 F.2d 270, 281 (2d Cir. 1984); *see* 29 U.S.C. § 1001(a) (congressional findings that, among other things, safeguards must be provided with respect to establishment, operation, and administration of employee benefit plans to protect the interests of employees and their beneficiaries).

In his First through Fourth causes of action, Finkel has adequately pleaded that Hall-Mark failed to make required contributions to the Plans and thereby violated the terms of both ERISA and of the CBA – a non-ERISA source obligating parties to make contributions to the Funds according to the CBA's terms.[7] He has alleged that Hall-Mark, as an employer within the statute's meaning, elected to provide benefits to its employees by virtue of its agreement to enter into the CBA, and that it thereafter failed to make the required benefits contributions. I therefore recommend that the court find Hall-Mark liable for those contributions that it establishes to a reasonable certainty are owed to the Joint Board.

However, Finkel has not established that Hall-Mark is liable for the failure to pay the union dues of certain employees (a claim of liability that arises only under Finkel's fourth cause of action, *see* Complaint ¶¶ 6, 59). First, notwithstanding the Complaint's allegation, the record conclusively demonstrates that the CBA required Hall-Mark to remit union dues to Local 3 – not

---

[7] Finkel alleges the first four causes of action against Hall-Mark alone. *See* Complaint ¶¶ 48-59.

to the Joint Board on which Finkel serves. CBA at 11 (providing that union dues are to be "sent monthly ... to the Financial Secretary, Local Union No. 3");[8] *but see* Complaint ¶ 6 (alleging that the CBA required Hall-Mark to remit union dues "to the Joint Board"). By making a claim for such dues, Finkel seeks money he was never owed. Second, there is nothing in the record to support the proposition that any of Hall-Mark's employees, let alone those for whom Hall-Mark failed to make contributions to the Plans, had authorized Hall-Mark to deduct their union dues and deliver them to Local 3 on their behalf.[9] Without proof of such written authorization, there is no reason to conclude that Hall-Mark owed dues to anyone, let alone to Finkel who would never have been entitled to them in any event. Finally, in the Complaint's prayer for relief, Finkel made no mention of a request for any unpaid union dues (or, to use the Complaint's terminology, contributions to a "Non-ERISA Plan"). *See* Complaint at 14-15. Accordingly, even if Finkel eventually does serve the pending pleading on Hall-Mark, that pleading will not suffice to establish the defendant's liability to this plaintiff for any employee's union dues.

### 3. Withdrawal Liability

#### a. Hall-Mark

The allegations in the Complaint suffice to establish liability, provided Hall-Mark does ultimately admit them by default. Finkel has properly alleged that Hall-Mark permanently ceased

---

[8]  In contrast, the CBA explicitly provides that the contributions for specific Plans are to be sent to the respective Plans themselves. *See*, *e.g.*, CBA at 14 (providing that certain "contributions and payroll reports are to be submitted weekly to the Employees Security Fund of the Electrical Products Industries").

[9]  The only remotely relevant submission on this score is a letter dated March 13, 1997, and addressed to "All employers of "A" rated journeymen," which requests those employers' assistance in implementing an increase in the dues rate. *See* Sessa Dec. Ex. C (DE 12-5 at 2). Such evidence plainly provides no support for the pertinent factual proposition.

its operations covered by the plan.  Assuming that Hall-Mark fails to contest that allegation, Finkel will have established that the company thereby ended its obligation to contribute to the Pension Plan, and therefore effected a complete withdrawal from that Plan.

In addition, Finkel has established that the Joint Board sent the Demand Letter to Hall-Mark to notify it of the withdrawal liability claim and that Hall-Mark did not timely challenge that determination or accede to the demand.  *See* 29 U.S.C. § 1401(a), (b)(1); *see also Vacca v. Bridge Chrysler Jeep Dodge, Inc.*, 2008 WL 4426875, at *5-7 (E.D.N.Y. Sept. 4, 2008) (discussing the elements for liability under the MPPAA); *Trustees of the Local 531 Pension Plan v. Corner Distrib., Inc.*, 2008 WL 2687085, at *4 (E.D.N.Y. July 8, 2008) (same). I therefore respectfully recommend that in the event Finkel timely cures his failure to serve the Second Amended Complaint on Hall-Mark, the court find that defendant liable on the fifth cause of action.

b.     Other Defendants

The Complaint alleges, and the defendants' default establishes, that defendants Zizza and Primary are both wholly owned by Salvatore J. Zizza.  Complaint ¶¶ 43-45.  ERISA provides that "all ... trades or businesses ... under common control shall be treated as ... a single employer."  29 U.S.C. § 1301(b)(1).  Under the pertinent regulation promulgated pursuant to ERISA, sibling entities that are all wholly-owned by the same person are deemed to be under such common control.  *See*  26 C.F.R. § 1.414(c)-2(c).  As a result, Zizza and Primary are both jointly and severally liable for Hall-Mark's withdrawal liability.  I therefore respectfully recommend that the court find those defendants liable on the Fifth Cause of Action.

B.    Damages

1.    Unpaid Contributions

According to Finkel's submissions, Hall-Mark has failed to pay the employee benefit contributions owed to the ERISA Funds for several weeks in March and April of 2007.  The Complaint and the submissions in support of the motion for default judgment are inconsistent with regard to the weeks in which Hall-Mark owes contributions: the Complaint alleges that Hall-Mark failed to pay the required contributions for the weeks ending March 14, 2007 through April 18, 2007, while the motion for default judgment seeks damages for an additional week ending on April 25, 2007.  *Compare* Complaint ¶ 21 *with* Hock Dec. ¶ 7.   In the Complaint, Finkel alleges that Hall-Mark permanently ceased operations on or about April 20, 2007. Complaint ¶ 19.  Finkel now seeks to obtain additional contributions via this default judgment proceeding for a week in which he alleges that Hall-Mark was no longer conducting business and for which Hall-Mark did not submit payroll records, and proposes to estimate the amounts due to the plans for that week.  *See* Hock Dec. ¶ 8.

Finkel has adduced sufficient evidence to support his claim for damages based on the unpaid contributions for the period specified in the Complaint by submitting summaries of the contributions owed to each fund for each week, as well as the underlying payroll reports from which the summaries were made.  *See* Hock Dec. Exs. D-E; Sessa Dec. Exs. D-E (DE 12-5 at 3-12).  However, although those summaries also provide an estimate of the contributions owed to each Plan for the additional week mentioned only in the motion, I conclude for the following reasons that the court should exclude that period from its award.

Even if Hall-Mark had continued its operations during the additional week in question, Hall-Mark's default establishes only the truth of Finkel's allegation that Hall-Mark was obliged to make certain contributions to the Funds during the weeks ending March 14 through April 18, 2007.  Complaint ¶ 21.   What Hall-Mark's default does not establish, however, is any liability with respect to contributions it may have owed for the week ending April 25, 2007.  The Complaint contains no allegations about those contributions – to the contrary, it alleges that Hall-Mark ceased operations during that week – and Hall-Mark's default, assuming it is eventually established, will therefore do nothing to establish any debt for that extra week.

The Federal Rules of Civil Procedure generally prohibit a court from ordering a defaulting defendant to pay damages beyond those demanded in the complaint.  Fed. R. Civ. P. 54(c); *see Trustees of the Plumbers and Pipefitters Nat'l Pension Fund v. Daniel Weintraub & Assoc., Inc.*, 2007 WL 4125453, at *5 (E.D.N.Y. Nov. 16, 2007) (citing *Scala v. Moore McCormack Lines, Inc.*, 985 F.2d 680, 683 (2d Cir. 1993)).  The purpose of the rule is to allow a defendant to make an informed decision, based on the relief requested in the original pleading, as to "'whether to expend the time, effort, and money necessary to defend the action.'" *Id.* (citing *King v. STL Consulting, LLC.*, 2006 WL 3335115, at *4 (E.D.N.Y. Oct. 3, 2006) (quoting 10 Wright, Miller & Kane, Federal Practice & Procedure:  Civil 3d § 2663 (1998))).  However, where the purpose of the rule is achieved and the defaulting defendant does have sufficient notice, Rule 54(c) is not an absolute bar to the award of damages that accrue during the pendency of an action.  *King*, 2006 WL 3335115, at *5 (citing *Fustok v. Conticommodity Serv., Inc.*, 122 F.R.D. 151, 157 (S.D.N.Y. 1988)).  Thus, when a defendant is on notice that a default judgment could exceed the amount requested in the complaint, additional damages may be awarded.  *Id.*

(awarding damages that accrued during pendency of ERISA default action); *Trustees of the Plumbers and Pipefitters National Pension Fund*, 2007 WL 4125453, at *6 (same); *Ames v. STAT Fire Suppression, Inc.*, 227 F.R.D. 361, 362 (E.D.N.Y. May 25, 2005) (same). Because there was no notice to Hall-Mark in the Complaint that Finkel might seek damages for this additional week, and because, to the contrary, Finkel alleged that Hall-Mark had ceased to conduct business by the middle of the week in question, I decline to recommend that the court award damages for unpaid contributions during that time.

I also recommend against awarding any damages relating to the 401(k) Plan. The Complaint alleges that Hall-Mark failed to remit employee contributions to the 401(k) Plan for the weeks ending April 11 and April 18, 2007.[10] Complaint ¶ 21. However, the summary that Finkel submitted, which identifies the weeks for which Hall-Mark failed to submit contributions, reflects that the 401(k) benefits were "paid" for the weeks in question, and Finkel has submitted nothing else to prove that Hall-Mark failed to remit the required 401(k) Plan contributions. *See* Sessa Dec. Ex. E (DE 12-5 at 12). Because a default does nothing to establish damages, Finkel's failure to prove any damages arising from Hall-Mark's liability with respect to the 401(k) Plan precludes any monetary award on that aspect of his claim.[11]

Excluding from Finkel's calculations the unpaid contributions for the week not mentioned in the Complaint, and also excluding any damages relating to the 401(k) Plan or to the union

---

[10] Finkel's subsequent submissions combine the 401(k) Plan contributions allegedly owed with those owed to the other Plans, and suggest that the 401(k) contributions are owed for a broader range of dates than specified in the Complaint. *See, e.g.*, Hock. Dec. ¶ 7 ("Hall-Mark has failed to remit and currently owes contributions to the...[401(k) Plan]...for the period of weeks ending March 14, 2007 through April 25, 2007.").

dues to which Finkel is not entitled, I conclude that Hall-Mark owes the following amounts in

unpaid contributions for the weeks ending  March 14, 2007 through April 18, 2007:

| | |
|---|---|
| Pension Plan: | $35,731.55 |
| Annuity Fund: | $4,120.00 |
| Educational Fund: | $992.54 |
| TOTAL: | $40,844.09 |

I therefore respectfully recommend that if and when Finkel establishes Hall-Mark's liability on

the first four causes of Action, the court award Finkel $40,844.09.

2.      Withdrawal Liability

The court need not hold a hearing on damages to determine the amount of damages due to

Finkel on the Fifth Cause of Action relating to withdrawal liability.  Assuming that Finkel

ultimately serves Hall-Mark and the company then defaults, its failure to timely contest the Joint

Board's determination of the amount due will suffice to establish that debt as a matter of law.

*See* 29 U.S.C. § 1401(b)(1).  Moreover, because Hall-Mark has waived its right to contest the

amount of withdrawal liability, and because Zizza and Primary are considered the same

employers for purposes of that claim, the latter two defendants are likewise barred from

contesting the amount.  I therefore respectfully recommend that the court award Finkel damages

in the amount of $273,209.00 on the Fifth Cause of Action.

3.      Interest

a.      Interest on Unpaid Contributions

Finkel is entitled to receive interest on the amount of unpaid contributions that he has

proven.  ERISA provides that such interest should be calculated using the rate in the relevant

benefit plan or, if none, the rate prescribed by 26 U.S.C. § 6621.  29 U.S.C. § 1132(g)(2).  Some

of the relevant Plans did not prescribe an interest rate on delinquent contributions, and Finkel has

therefore properly applied the statutory annual rate of eight percent in effect during the period at

issue. *See* Hock Dec. ¶ 11 & Ex. D; Sessa Dec. ¶ 17; U.S. Department of Labor, IRC 6621(a)(2)

Underpayment Rates, http://www.dol.gov/ebsa/calculator/a2underpaymentrates.html (last visited

September 24, 2009). Finkel has correctly calculated interest for these Plans on a per diem basis.

The only relevant Plan that does specify an interest rate is the Pension Plan, which provides for

interest at a monthly rate of 1.5 percent. Hock Dec. ¶ 12; DE 12-4, Sessa Dec. Ex. B (Pension

Plan agreement), § 9.1(F)(ii). Finkel has used that rate in calculating interest on the unpaid

contributions for that Plan (and has properly done his calculations on a monthly, rather than per

diem, basis), and I recommend the court do likewise. With respect to all of the Plans, Finkel has

included interest on estimated contributions for the week ending April 27, 2009; because I

recommend against an award of damages for that week, I have excluded the corresponding

interest from my calculations.

I recommend against awarding any interest for delinquent contributions to the 401(k) Plan

or for union dues, because Finkel has not established that Hall-Mark is liable for either category

of damages.[12] Moreover, even if there was a basis for awarding damages for unpaid union dues,

Finkel has apparently invented out of whole cloth a claim for interest on such dues at an annual

---

[12] Finkel requests interest on past contributions to the 401(k) Plan that remained unpaid at the outset of this litigation. More specifically, Finkel seeks an award of interest to replace a dishonored check that Hall-Mark had previously submitted to the Joint Board. *See* Second Amended Complaint ¶¶ 23-25; Sessa Dec. Ex. F; Memo at 19-20. Because Finkel has not established Hall-Mark's liability for any unpaid 401(k) contributions, I recommend that the court award no damages on this aspect of his claim. However, even if Finkel had established such liability, I would recommend against an award of such damages because he has not sufficiently documented them to a reasonable certainty.

rate of 8.75 percent.  *See* Memo. at 18 (citing Hock Dec. ¶ 18 & Ex. E at 1); Hock Dec. ¶ 18

(citing Hock Dec. Ex. E at 1); Hock Dec. Ex. E at 1 (citing nothing); *see also* Hock Dec. ¶ 11

(citing Sessa Dec. ¶ 17 as authority for the proposition that during the relevant period, "the Joint

Board used the interest rate of the prime rate plus one-half percent for delinquent contributions to

the Non-ERISA Plans"); Sessa Dec. ¶ 17 (citing no authority for the same proposition).  The

CBA is silent with respect to interest on unpaid union dues, *see* CBA at 11, and the payment of

union dues is not governed by ERISA and therefore not subject to its provisions relating to

statutory interest.

As a result of the foregoing analysis, I calculate the following amounts of interest due,

which are slightly lower than the sums Finkel seeks:

| Fund | Principal | Rate | Interest |
|------|-----------|------|----------|
| Pension Plan | $35,731.55 | 1.5% per month | $10,198.35 |
| Annuity Fund | $4,120.00 | 5% per year | $590.75 |
| Educational Fund | $992.54 | 5% per year | $141.96 |
| Total | | | $10,931.06 |

I therefore respectfully recommend that the court grant that a total award of $10,931.06 in

interest on unpaid contributions in the event Finkel establishes Hall-Mark's default.

b.    Interest on Withdrawal Liability

Finkel also seeks interest on the withdrawal liability, which is mandatory under the

provisions of both ERISA and the Pension Plan agreement.   *See* 29 U.S.C. § 1132(g)(2); Sessa

Dec. Ex. B, § 9.1(E).  In calculating that interest award, Finkel has once again failed to provide

certain relevant information and has also made the task needlessly complex.  Finkel relies on the

following provision of the Pension Plan agreement:

18

> Interest shall be charged on any amount in default from the date the payment was
> due to the date it is paid at an annual rate equal to the prime rate charged by the
> [sic] Citibank, N.A., on the first day of the calendar quarter preceding the due date
> of the payment. For each succeeding twelve (12) month period that any amount in
> default remains unpaid, interest shall be charged on the unpaid balance (including
> accrued interest) at the prime rate in effect on the anniversary date of the date as
> of which the initial interest rate was determined.

Sessa Dec. Ex. B § 9.1(E).

Purporting to apply that provision, Finkel has calculated interest at an annual rate of

8.00%. However, he has done nothing to establish that that is the correct rate: there is simply no

evidence in the record as to the "prime rate charged by the [sic] Citibank, N.A." at any time.[13]

Accordingly, Finkel has failed to prove with reasonable certainty the amount of interest damages

for the withdrawal liability, and the court should therefore apply the statutory default provision in

the MPPAA and related regulations. *See* 29 U.S.C. § 1399(c)(6); 29 C.F.R. § 4219.32(c). The

Pension Benefit Guaranty Corporation has collated the applicable rates, and reports them to be

the following for each of the relevant calendar quarters:

| Calendar Quarter | Rate |
| --- | --- |
| July-September 2007 | 8.25% |
| October-December 2007 | 8.25% |
| January-March 2008 | 7.25% |
| April-June 2008 | 6.00% |
| July-September 2008 | 5.00% |
| October-December 2008 | 5.00% |
| January-March 2009 | 4.00% |

Pension Benefit Guaranty Corporation, Overdue or defaulted withdrawal liability,

http://pbgc.gov/practitioners/interest-rates/content/hr1130.html (last visited September 24, 2009).

---

[13] That omission relieves the court of the need to parse the meaning of "the first day of the
calendar quarter preceding the due date of the payment." In the circumstances of this case, the
provision could be interpreted to mean either April 1 or July 1 of 2007.

Applying those rates to a principal amount of $11,170.25 for the period from July 30 through August 30, 2007, and to a principal amount of $273,209.00 for the period from August 31, 2007 through January 9, 2009 (the end of the period for which Finkel has requested such interest) produces the following results:[14]

| Calendar Quarter | Rate | Days | Interest |
|---|---|---|---|
| July-September 2007 | 8.25% | 62 | $1,992.60 |
| October-December 2007 | 8.25% | 92 | $5,681.25 |
| January-March 2008 | 7.25% | 91 | $4,924.85 |
| April-June 2008 | 6.00% | 91 | $4,075.74 |
| July-September 2008 | 5.00% | 92 | $3,433.77 |
| October-December 2008 | 5.00% | 92 | $3,433.77 |
| January-March 2009 | 4.00% | 09 | $269.47 |
| Total | | | $23,811.45 |

I therefore respectfully recommend that the court grant that a total award of $23,811.45 in interest on Hall-Mark's withdrawal liability.

4.    Additional Damages

In addition to an award of delinquent contributions and interest, ERISA also provides for an award in "an amount equal to the greater of (i) interest on the unpaid contributions, or (ii) liquidated damages provided for under the plan in an amount not in excess of 20 percent [of unpaid contributions]."  29 U.S.C. § 1132(g)(2).  Finkel properly seeks to recover such additional statutory damages by applying the first of the quoted provisions (interest on unpaid contributions) to the Pension Plans, and by applying the second provision (20 percent of unpaid contributions) to the other two relevant Plans.  Because of the errors he has made in calculating the unpaid

_____

[14]  Finkel correctly seeks interest only for the amount of the first installment payment for the first month at issue.  The demand for accelerated payment of the entire withdrawal liability amount only took effect a month later.

contributions and interest, however, I have substituted the following calculations, based on the analysis of the contributions and interest awards set forth above:

| | |
|---|---|
| Pension Plan: | $10,198.35 |
| Annuity Fund: | $824.00 |
| Educational Fund: | $198.51 |
| TOTAL: | $11,220.86 |

I therefore respectfully recommend that in the event Finkel establishes that Hall-Mark is in default on the first four causes of action, it award $11,220.86 in liquidated damages

The same liquidated damages provision is also available with respect to withdrawal liability under the MPPAA. *See* 29 U.S.C. § 1451(b) (providing that an employer liable for withdrawal liability payments under the MPPAA "shall be treated in the same manner as [an employer liable for] a delinquent contribution"); *Trustees of Local 531 Pension Plan v. Corner Distributors, Inc.*, 2008 WL 2687085, at *5 (E.D.N.Y. July 8, 2008) (applying that provision to liquidated damages). Finkel therefore properly seeks liquidated damages equal to 20 percent of the principal amount of $273,209.00, or $54,641.80. I therefore respectfully recommend that the court grant that request.

### 5. Attorneys' Fees

Finkel seeks reimbursement of $15,560.50 in attorneys' fees for 109.4 hours of compensable work. *See* Hock Dec. ¶ 27. The relevant statutory provision makes an award of reasonable attorneys' fees obligatory, not discretionary. *See* 29 U.S.C. §§ 1132(g)(2), 1145; *LaBarbera v. Hauserman, Inc.*, 369 F.3d 224, 226 (2d Cir. 2004). Courts in this circuit assess such fee applications using the "lodestar method," under which a reasonable hourly rate is multiplied by a reasonable number of hours expended. *See Luciano v. Olsten Corp.*, 109 F.3d

111, 115 (2d Cir. 1997); *King v. JCS Enterprises, Inc.*, 325 F. Supp. 2d 162, 166 (E.D.N.Y. 2004) (citing *Green v. Torres*, 361 F.3d 96, 98 (2d Cir. 2004); *Quaratino v. Tiffany & Co.*, 166 F.3d 422, 425 (2d Cir. 1999)). Although "[t]he meaning of the term 'lodestar' has shifted over time, and its value as a metaphor has deteriorated to the point of unhelpfulness[,]" it has become so entrenched in the case law that its use is still permitted, if only as a convenient shorthand. *Arbor Hill Concerned Citizens Neighborhood Ass'n v. County of Albany*, 522 F.3d 182, 190 & n.4 (2d Cir. 2008). I use the term here only for such ease of reference, and without the artificial limitations that the court rejected in *Arbor Hill*.

District courts have broad discretion, using "their experience with the case, as well as their experience with the practice of law, to assess the reasonableness" of each component of a fee award. *Fox Indus., Inc. v. Gurovich*, 2005 WL 2305002, at *2 (E.D.N.Y. Sept. 21, 2005) (quoting *Clarke v. Frank*, 960 F.2d 1146, 1153 (2d Cir. 1992)). I therefore proceed to examine the reasonableness of both the hourly rates at which the plaintiff's attorneys seek to be compensated and the number of hours for which they seek reimbursement.

The plaintiff asks for an award of fees based on hourly rates ranging from $225 to $350 per hour for partners with 19 to 30 years of experience and $200 to $275 per hour for associates with three to eight years of experience, as well as $75 to $80 per hour for paralegal assistants. Although similarly experienced attorneys performing other kinds of work can and do command higher hourly rates, I see no reason why a paying client would agree to pay hourly rates in this range for the kind of work at issue here, particularly where other specialists performing the same kind of work who regularly practice in this district charge significantly less. *Daniel Weintraub*,

2007 WL 4125453, at *11 (finding that a reasonable client would pay an hourly rate of $210 for a partner's work on an ERISA default case).

I recognize that, in some circumstances, there have been plaintiffs who have succeeded in securing an hourly rate for their counsel comparable to (but slightly less than) the rate requested by the attorneys here. *See La Barbera v. J & A Concrete Corp.*, 2008 WL 918244, at *2-3 (E.D.N.Y. April 1, 2008) (modifying magistrate judge's recommendation to award fees at an hourly rate of $210, and instead calculating fee based on an hourly rate of $275). In *J&A Concrete*, however, the court based its decision in part on the fact that the attorney at issue had "nearly 40 years' of practicing experience; which distinguishes him from more junior attorneys in similar cases." *Id*. at *3. No attorney in this case had the same amount of experience, and the one responsible for the bulk of the legal work, attorney Hock, had no more than nine years of experience. As the court in *Arbor Hill* made clear – admittedly in the context of applying a different fee-shifting statute – the ultimate task in considering a reasonable hourly rate is to determine, under all of the circumstances, "the rate a paying client would be willing to pay." 522 F.3d at 190. In this context, I am persuaded that a paying client would be unwilling to pay hourly rates of up to $350 per hour for the services that the attorneys have rendered here. Of particular relevance to that determination is that in several of the many similar ERISA cases decided recently in this district, plaintiffs represented by counsel with experience comparable to the attorneys here have not even requested such high rates of reimbursement, but have instead asked for no more than $250 per hour. *See, e.g., Erath v. Academic Stone Setters, Inc.,* 2008 WL 4146200, at *3 (E.D.N.Y. Sept. 8, 2008) (adopting law firm partner's proposed hourly rate of $200 in ERISA contributions case); *Trustees of Plumbers Local Union No. 1 Welfare Fund,*

*Additional Sec. Ben. Fund, Vacation & Holiday Fund, Trade Educ. Fund and 401(K) Savings Plan v. Dan Yant*, 2007 WL 3036759, at *9 (E.D.N.Y. Oct. 16, 2007) (adopting recommendation in ERISA contributions case to accept as reasonable law firm partner's proposed hourly rate of $210). Because I do not see any reason why a paying client would be willing to pay Finkel's attorneys more than the amounts sought in similar cases such as *Erath* and *Dan Yant*, I recommend that the court base its fee award on an hourly rate of $200 for the three partners and $150 for the two associates. I further recommend that the rates sought for paralegal assistants be reduced to $70 per hour. *See Labarbera v. Andrew's Trucking Corp.*, 2007 WL 4224631, at *4 (E.D.N.Y. Nov. 26, 2007) (adopting magistrate judge's determination that rate of $70 per hour for a paralegal is reasonable).

A fee applicant bears the burden of demonstrating the hours expended and the nature of the work performed, preferably through contemporaneous time records that describe with specificity the nature of the work done, the hours expended, and the dates. *New York State Ass'n for Retarded Children, Inc. v. Carey,* 711 F.2d 1136, 1147-48 (2d Cir. 1983). Inadequate documentation is grounds for reduction of a fee award. *Hensley v. Eckerhart*, 461 U.S. 424, 433 (1983); *Levy v. Powell*, 2005 WL 1719972, at *7 (E.D.N.Y. Jul. 22, 2005). Having reviewed the plaintiff's submissions in this regard I am satisfied that they sufficiently document the 109.4 hours his counsel has billed. *See* Hock Dec. Ex. G. However, the number of hours billed for a case in which the defendants defaulted seems excessive, particularly in light of the number of errors and omissions in the motion papers now before the court. I recognize that this matter involved additional legal issues, namely withdrawal liability and the liability of the controlled group, which do not present in many of the ERISA default judgment cases decided in this

district.  Nevertheless, under all of the circumstances, I conclude that a significant reduction in the number of hours claimed is appropriate.

One acceptable method for "trimming the fat" from a fee application, and one that consumes fewer judicial resources than a painstaking review of each time-entry, is for the court to impose an "across-the-board percentage" cut of the total amount of time claimed.  *In re "Agent Orange" Products Liab. Litig.*, 818 F.2d 226, 237-38 (2d Cir. 1987).  Under the circumstances of this case, I recommend reducing the number of hours for which Finkel may demand reimbursement from the defendants by 40 percent.  Mutiplying those reduced hours by the adjusted hourly rates in the chart below produces the following results:

| Position | Adjusted Hours | Adjusted Rate | Total Fee |
|----------|---------------|---------------|-----------|
| Partners | 1.26 | $200 | $252.00 |
| Associates | 23.04 | $150 | $3,456.00 |
| Paralegal Assistants | 41.34 | $70 | $2,893.80 |
| Total | 65.64 | $100.58 (average) | $6,601.80 |

Accordingly, I respectfully recommend that the court award of $6.601.80 in attorneys' fees.

### 6.    Other Litigation Costs

The plaintiff seeks reimbursement of a total of $1,536.98 in costs, consisting of the $350 filing fee, $248.00 for service of process, $737.15 in search fees, and "additional expenses" of $201.83.  Hock Dec. ¶¶ 31-32.  The amounts claimed for the filing fee and for service of process are adequately documented on the docket or in Finkel's submissions, *see* Hock. Dec. Ex. G, and should be reimbursed.  As for the search fees, Hock states in his declaration that these "refer to computer research fees incurred in identifying Hall-Mark's controlled group," but provides no documentation of those fees.  *Id.* ¶ 32.  Finkel has similarly provided no documentation for the

other additional expenses that he claims. I therefore respectfully recommend that the court reject the latter portions of Finkel's request and award Finkel a total of $598.00 in litigation costs.

III.     Recommendation

For the reasons set forth above, I respectfully recommend that the court allow plaintiff Dr. Gerald Finkel an opportunity to serve the Second Amended Complaint on defendant Hall-Mark Electrical Supplies Corp. no later than the deadline for filing objections to this Report and Recommendation. If that defendant thereafter defaults, I respectfully recommend that the court enter an order awarding judgment as follows: on the first four causes of action, relating to liability for unpaid contributions to benefit plans, judgment against defendant Hall-Mark Electrical Supplies Corp. alone in the total amount of $62,996.01 (consisting of $40,844.09 in unpaid contributions; $10,931.06 in interest; and $11,220.86 in statutory liquidated damages); on the fifth cause of action, relating to withdrawal liability, judgment against all defendants jointly and severally in the total amount of $358,862.05 (consisting of $273,209.00 in substantive withdrawal liability; $23,811.45 in interest; $54,641.80 in statutory liquidated damages; $6,601.80 in attorneys' fees; and $598.00 in litigation costs).[15]

IV.     Objections

I direct the plaintiff's counsel to provide a copy of this Report and Recommendation to each defendant no later than September 29, 2009, and to file proof of such service no later than October 2, 2009. Any objections to this Report and Recommendation must be filed no later than October 13, 2009. Failure to file objections within this period waives the right to appeal the

---

[15] Because attorneys' fees and costs are available for all of Finkel's claims, I conclude it is appropriate to include those amounts in the judgment against all of the defendants.

District Court's order.  *See* 28 U.S.C. § 636(b)(1); Fed. R. Civ. P. 72(b)(2); *Beverly v. Walker*,

118 F.3d 900, 902 (2d Cir. 1997); *Savoie v. Merchants Bank*, 84 F.3d 52, 60 (2d Cir. 1996).

      **SO ORDERED.**

Dated: Brooklyn, New York
       September 25, 2009

                                 /s/ James Orenstein
                                 JAMES ORENSTEIN
                                 U.S. Magistrate Judge